AO 106 (Rev. 04/10) Application for a Search Warrant

Shimeall / Litton

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>a red apple iPhone currently located at the ATF<br>Columbus I Field Office, 230 West Street, Suite 300,<br>Columbus, Ohio 43215 | )<br>)<br>)<br>)<br>)<br>)    Case No.    2:22-mj-389 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
a red apple iPhone currently located at the ATF Columbus I Field Office, 230 West Street, Suite 300, Columbus, Ohio 43215

located in the     Southern     District of     Ohio     , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A to the Affidavit submitted in support of the Application for this warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 USC § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms Without a License |
| Title 18 USC § 371 | Conspiracy |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Special Agent Teresa Petit**
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    6/1/2022

_____
Chelsey M. Vascura
United States Magistrate Judge
*Judge's signature*

City and state:    Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FOLLOWING IPHONES: BLACK APPLE IPHONE IN BLACK "MICASE" (TARGET TELEPHONE 1); MINT GREEN APPLE IPHONE IN OTTERBOX CASE (TARGET TELEPHONE 2); AND RED APPLE IPHONE (TARGET TELEPHONE 3), INCLUDING ANY REMOVABLE STORAGE MEDIA CONTAINED WITHIN THE PHONES, CURRENTLY LOCATED AT ATF COLUMBUS I FIELD OFFICE, 230 WEST STREET, SUITE 300, COLUMBUS, OHIO 43215. | Case No. _2:22-mj-389_____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Teresa Petit, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in further detail in Attachment A.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since May 2014.  I am a graduate of the ATF National Academy Special Agent Basic Training Program and the Federal Law Enforcement Training Center, Criminal Investigator Training Program.  As a result of my training and experience as an ATF Special Agent, I am familiar with Federal criminal laws pertaining to firearms violations.

As a Special Agent, I am also authorized to carry firearms, execute warrants, make arrests for the offenses against the United States, and perform other such duties as authorized by law.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  I did not, however withhold any information or evidence that would negate probable cause.

4.     Based on the facts set forth in this Affidavit, there is probable cause to believe that Martino D. LORENZI, (hereinafter "LORENZI"), Anthony D. REDMOND (hereinafter "REDMOND"), Charles L. JACKSON, (hereinafter "JACKSON") and others have committed violations of the following federal laws: 18 U.S.C. § 922(a)(5), that is, transferring a firearm to an out-of-state resident; 18 U.S.C. § 922(a)(1)(A), that is, engaging in the business of dealing in firearms without a license; 18 U.S.C. § 2, that is, aiding, abetting, counseling, commanding, or soliciting a criminal act; and 18 U.S.C. § 371, that is, two or more persons conspiring to commit any offense against the United States (all of the above offenses are collectively referred to throughout as the TARGET OFFENSES).  There is also probable cause to search the cellular telephone device identified below for evidence of these crimes and contraband or fruits of these crimes as described in Attachment A.  Moreover, as is explained below, there is further probable cause to search the cellular telephone devices identified below for evidence related to violations of the TARGET OFFENSES.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

5.     The property to be searched is a black Apple iPhone in a back "mi case" (**TARGET TELEPHONE 1**); mint green apple iPhone in Otterbox case (**TARGET**

2

TELEPHONE 2); and a red Apple iPhone (**TARGET TELEPHONE 3**), including any removable storage media contained within the phones, (hereinafter "the **TARGET TELEPHONES**"). The **TARGET TELEPHONES** are currently located at the ATF Columbus I Field Office, 230 West Street, Suite 300, Columbus, Ohio 43215. As explained below, **TARGET TELEPHONE 1** was seized from the possession of Charles L. JACKSON during a pat down search of his person incident to arrest, and **TARGET TELEPHONES 2 and 3** were recovered from the inside of a motor vehicle during the execution of a federal search warrant of the vehicle.[1] More specifically, **TARGET TELEPHONE 2** was recovered from the cupholder inside a motor vehicle, and **TARGET TELEPHONE 3** was recovered from the front passenger side floorboard of the vehicle. JACKSON was taken into custody because of a criminal complaint filed in Case No. 2:22-mj-376 (S.D. Ohio).

6. The applied-for warrant would authorize the forensic examination of the **TARGET TELEPHONES** for the purpose of identifying electronically stored data particularly described in Attachment A.

## PROBABLE CAUSE

### A. Chronological Background Regarding Ongoing Firearms-Trafficking

7. The investigation has indicated that Brian CUNNINGHAM, Mariah CUTLIP, Walter RATHBURN (W. RATHBURN), Tyson RATHBURN (T. RATHBURN), Martino D. LORENZI, and others, have committed violations of the TARGET OFFENSES.

---

[1] On May 27, 2022, S/A Teresa Petit obtained a federal search warrant for a 2014 Dodge Charger, VIN# 2C3CDXBG1EH265182, bearing Ohio license plate DEUCE17, case number 2:22-mj-380. The warrant was signed by U.S. Magistrate Judge Elizabeth A. Preston Deavers of the Southern District of Ohio.

8.     In approximately mid-December 2021, CUNNINGHAM's large volume of firearm purchasing came to the attention of ATF and other law enforcement officials. By way of summary background, the investigation has indicated that CUNNINGHAM had, between approximately July of 2021 and January 5, 2022, purchased approximately 238 firearms.

9.     The investigation has indicated that CUNNINGHAM stores firearms at his residence. On or about January 5, 2022, CUNNINGHAM voluntarily sat down with Your Affiant and other law enforcement to discuss his high-volume acquisitions, specifically that his high-volume acquisitions were of repeated type, manufacturer, and model of firearms. Your Affiant is aware from training and experience that these types of high-volume purchases in a short period of time, where the guns are of a similar type, manufacturer, and model, is indicative of straw purchases and/or firearms trafficking. During this interview CUNNINGHAM described himself as a firearm collector. He explained he was investing in firearms as a retirement investment and only periodically resold firearms from his "private collection" that he was no longer interested in. During this conversation CUNNINGHAM indicated that he stores his "private collection" in a large safe inside his garage located at his residence. Law enforcement explained to CUNNINGHAM that if he decides to make a profit selling his firearms in the future that he would need to apply for a Federal Firearms License (FFL). Following the interview, CUNNINGHAM forwarded law enforcement numerous photographs, which he indicated were from inside his house, depicting various firearms located in safes.

10.    Between the dates of on or about March 4 through on or about March 11, 2022, CUNNINGHAM purchased approximately sixty-five (65) firearms from the same FFL located in the Southern District of Ohio. Those firearms were purchased across three (3) different transactions. The purchases accounted for: ten (10) Taurus-manufactured, G3C model, 9mm

4

caliber, semi-automatic handguns; twenty-four (24) SCCY Industries, model CPX-2, semi-automatic handguns; twenty-three (23) Glock-manufactured, semi-automatic handguns in various models and calibers; and eight (8) Smith and Wesson-manufactured, M&P 9 model, 9mm caliber, semi-automatic handguns. Again, through training and experience, Your Affiant is aware that an individual who engages in repetitive acquisition of similar firearms is an indicator of someone acquiring the firearms for resale.

11. On or about March 16, 2022, CUTLIP entered an FFL located in the Southern District of Ohio and purchased a total of sixty-seven (67) firearms between two transactions. One transaction accounted for six (6) Taurus-manufactured, model G3C, 9mm, semi-automatic, handguns. The second transaction accounted for a total of sixty-one (61) firearms. Of those sixty-one (61) firearms, nineteen (19) were Taurus-manufactured, model G3C, 9mm, semi-automatic handguns; forty (40) were SCCY Industries-manufactured, model CPX-2, 9mm, semi-automatic handguns; and two (2) were Ruger-manufactured, model 57, 57 caliber, semi-automatic handguns. Your Affiant knows through training and experience that these firearms are not a firearm model typically collected, given that they are viewed as items that are not hard to acquire. Through further investigation, investigators learned that CUTLIP transferred the firearms from her possession within hours of the purchase to T. RATHBURN.

12. On or about March 21, 2022, investigators spoke with the owner of the FFL where CUTLIP completed her transaction. During the conversation with that FFL, investigators learned that CUTLIP's order for the sixty-seven (67) firearms was placed by another individual further identified as Brian CUNNINGHAM. CUNNINGHAM contacted the FFL to place the order for the firearms, provided CUTLIP's full name and address, and acted as a middleman between CUTLIP and the FFL. The FFL stated that once the order was complete, he/she notified

CUNNINGHAM that the order was ready for pick-up, and soon thereafter CUTLIP came to the location to complete the purchase. The FFL stated that CUTLIP's transaction was approximately $9,030.00 and was paid entirely in cash provided by CUTLIP.

13. Continuing on or about March 21, 2022, investigators again spoke with the owner of the FFL and learned that CUNNINGHAM had placed an order approximately two weeks prior through another individual later identified as W. RATHBURN. The FFL stated he/she received a text message from CUNNINGHAM with a picture of handwritten notes that contained the firearm order with the name "Walter" written on it. Investigators located records that indicate W. RATHBURN had purchased approximately fifty-two (52) firearms between three (3) separate transactions on or about March 11, 2022. Of those fifty-two (52) firearms: thirty-six (36) were SCCY Industries-manufactured, model CPX-2, 9mm caliber, semi-automatic handguns; and sixteen (16) were Glock-manufactured, semi-automatic handguns in various models and caliber. Investigators learned that W. RATHBURN's firearm transactions came to a combined approximate total of $13,270. Investigators learned that, on one of the occasions, CUNNINGHAM accompanied both W. RATHBURN and T. RATHBURN to the FFL; and, after departing from the FFL, most of the firearms were then transferred to CUNNINGHAM with T. RATHBURN retaining some.

14. Your Affiant is aware from training and experience that the above-described transactions bear strong indicators of illegal straw purchasers. By way of background, pursuant to federal law and regulation, the FFL is required to obtain a completed ATF Form 4473 (the "Firearms Transaction Record") from the actual purchaser of a firearm before the FFL can transfer or sell a firearm to any unlicensed person. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124. ATF Form 4473 gathers a host of information about the purchaser, including information to

6

determine if the purchaser may lawfully possess a firearm. FFLs also may not transfer a firearm to an unlicensed person without first conducting a background check through the National Instant Check System (NICS) and recording the information on the ATF Form 4473. 18 U.S.C. § 922(t); 27 C.F.R. § 478.102. The NICS process is run by the Federal Bureau of Investigation (FBI) and provides the mechanism through which FFLs determine whether a particular purchaser is prohibited from possessing firearms. Providing false or misleading information to an FFL in connection with the acquisition of a firearm, e.g., lying on the ATF 4473, is violation of federal law. 18 U.S.C. § 922(a)(6). Additional information asked on the ATF 4473 includes the following question: "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)?" A bold warning is also provided with this question: "You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you." Marking yes to the above question, and then transferring the purchased firearms to the actual buyer, qualifies as an illegal straw purchase in violation of 18 U.S.C. § 922(a)(6).

15. In my training and experience, it is common for individuals who otherwise intend to divert the firearm(s) to criminal possession to use a straw purchaser to complete the retail transaction on their behalf or to acquire firearms from other unlicensed individuals. It is also common for straw purchasers to receive a benefit of some type—in this situation, a monetary benefit—to assume the risk of purchasing the firearm. More specifically a "straw" purchase is described as the acquisition of a firearm(s) from a dealer by an individual (the "straw"), done for the purpose of concealing the identity of the true intended recipient or transferee of the firearm(s). Investigators learned that both CUTLIP and W. RATHBURN completed the ATF

7

Form 4473 during their respective firearms purchases. During the continued investigation, investigators learned that CUNNINGHAM was seeking individuals who would pick up firearm orders for compensation of approximately $500.

16. On or about March 22, 2022, investigators learned that a firearm originally purchased by W. RATHBURN on or about March 11, 2022, was recovered by law enforcement officials in Rochester, New York. The time-to-crime recovery for this firearm is approximately ten (10) days. Your Affiant knows from training and experience that a 10-day time-to-crime is a short amount of time and is an indicator of firearms trafficking. Most individuals who purchase firearms retain them for extended periods, up to years in length. Therefore, whenever a firearm is recovered in a criminal offense shortly after it was purchased, it is highly likely that the firearm was diverted to the criminal possession in some sort of firearm-trafficking scheme. Your Affiant also knows from training and experience that a shorter time-to-crime period (that is, anything under a year) for the firearm recovery is an indicator that the original purchaser was in fact a straw purchaser who knowingly transferred the firearm to another individual after the purchase. Moreover, relevant here, Your Affiant is further aware from training and experience that, when firearms are recovered outside of the original purchase state with a such a short time-to-crime, it is an indicator of conduct violative of 18 U.S.C. § 922(a)(5) (transfer of firearm(s) to an out-of-state resident).

17. On or about March 22, 2022, investigators executed a federal search warrant at CUNNINGHAM's residence. During the execution of the search warrant investigators learned that additional documents and items of evidence had been thrown away in a nearby dumpster. Investigators searched the dumpster and recovered two (2) receipt books that documented numerous firearms sales. One name observed in the receipt book was LORENZI and the second

was "Apollo." The investigation has indicated that LORENZI is a resident of the Cleveland, Ohio area. Additionally, investigators learned another purchaser was Anthony REDMOND, another resident of Cleveland, Ohio. Further related to LORENZI, REDMOND, and JACKSON, the investigation has demonstrated that all three individuals have, on occasion, traveled from Northern Ohio to the Columbus area to obtain firearms from both T. RATHBURN and/or CUNNINGHAM as part of the illegal activities outlined in this Affidavit. To that end, investigators have identified that LORENZI, REDMOND, and JACKSON have done so with regard to more than 116 firearms, to include the firearms recovered in New York. Investigators also recovered three (3) additional receipts that documented firearm purchases by REDMOND between the dates of March 5–14, 2022. When CUNNINGHAM and T. RATHBURN conducted their sale of firearms with LORENZI and REDMOND, LORENZI and REDMOND displayed an Ohio driver's license. The investigation has indicated that REDMOND is a prior convicted felon.

18.     The investigation has also led to the review of separate cellular conversations between T. RATHBURN and LORENZI, as well as T. RATHBURN and JACKSON, which provide further evidence of the arrangements and purchases of the firearms. The text messages indicate, for example, that LORENZI, and others, were placing orders with T. RATHBURN and others for the purchase of a number of the firearms at issue, and then arranging for the transfer of the firearms from T. RATHBURN to others associated with LORENZI. Both cellular telephone numbers utilized to communicate with T. RATHBURN were determined by investigators to be Voice Over IP (VOIP) and/or secondary text messaging applications and not originating from a cellular provider, all of which functioned to encrypt the communications. Your Affiant knows through training and experience that the use of secondary texting and VOIP telephone numbers is

a method often used to conceal identity and, depending on the circumstances, is a step taken to elude law enforcement detection.

19.     Moreover, the above-described text messages between T. RATHBURN and LORENZI indicate that LORENZI himself and others have traveled from Northern Ohio to the Southern District of Ohio to pick up firearms.  The investigation has further indicated that LORENZI did so driving a dark blue Dodge Charger.

20.     Also relevant here, the investigation has indicated that additional firearms related to the allegations in this Affidavit have been recovered in the State of New York.  In or around March of 2022, a total of two undercover purchases of firearms and a search warrant of a residence were conducted by law enforcement in the State of New York, which yielded the seizure of multiple firearms traced back to purchases made by W. RATHBURN, T. RATHBURN and/or CUTLIP.

21.     Investigators conducted a query of ATF databases, which returned negative results for CUNNINGHAM, CUTLIP, W. RATHBURN, T. RATHBURN, JACKSON, LORENZI, or REDMOND having any current affiliations related to ownership or licensing with other FFLs.

22.     From on or about March 30 through on or about March 31, 2022, investigators conducted surveillance at several locations in the Greater Cleveland area in an attempt to locate a dark blue Dodge Charger bearing Ohio license plate DEUCE17, known to be operated by Martino LORENZI. On or about March 30, 2022, shortly after beginning surveillance, the aforementioned Dodge Charger was observed backing into the driveway of 3613 Hildana Road. The driver of the vehicle was observed exiting the driver's door carrying what appeared to be grocery style bags into the residence using the door on the North side of the residence, which is

directly off the driveway. After a while, a black male, fitting the physical description of Martino LORENZI, exited the residence and entered the driver's seat of the Dodge Charger. Mobile surveillance began of the Dodge Charger and within a short period of time, investigators were able to confirm LORENZI was operating the Dodge Charger. On or about March 31, 2022, investigators conducted additional surveillance, during which they observed the Dodge Charger parked in the driveway of 3613 Hildana Road. Investigators observed LORENZI exit the residence and enter the driver's seat of the Dodge Charger. Investigators conducted mobile surveillance of LORENZI until he returned to his residence.

23.     More recently, on April 12, 2022, ATF S/A Penfield obtained a federal search warrant for a GPS tracker on the aforementioned Dodge Charger. The warrant was signed by United States Magistrate Judge William H. Baughman Jr. for the Northern District of Ohio. On April 16, 2022, ATF Special Agents from the Cleveland Field Office executed the tracker warrant by installing a GPS tracker unit on the Dodge Charger at LORENZI's residence located at 3613 Hildana Road, Shaker Heights, Ohio 44120.

24.     On April 20, 2022, investigators conducted surveillance at several locations in the Greater Cleveland area. Throughout surveillance, investigators observed LORENZI operating the dark blue Dodge Charger driving around the Greater Cleveland area. At approximately 4:00PM, investigators observed the Dodge Charger backed into the driveway of the LORENZI's residence and LORENZI standing at the trunk of the Charger.

25.     On May 16, 2022, ATF S/A Janna Penfield obtained another federal search warrant for the continued use of a GPS tracker on the Dodge Charger, case number 1:22MJ9103. The warrant was signed by United States Magistrate Judge William H. Baughman Jr. for the Northern District of Ohio.

26.     Between the dates of approximately March 25, 2022, and May 26, 2022, LORENZI, with others, coordinated the purchase of sixteen (16) SCCY Industries, model CPX-2, 9mm, semi-automatic handguns for $5,200.  This coordination included text messages and a telephonic conversation with an ATF SA acting in an undercover (UC) capacity to arrange the purchase for May 26, 2022.  On May 25, 2022, your affiant observed LORENZI operating the Dodge Charger in and around the area of his listed residence in Shaker Heights, Ohio.

27.     In the early morning of May 26, 2022, the GPS tracker affixed to the Dodge Charger indicated that the vehicle departed from Hildana Avenue and traveled to the area of Stickney Avenue, which is where investigators have identified a residence associated to JACKSON.  Soon after, the GPS tracker data indicated the vehicle was at Huntington Bank located on Ridge Road, Cleveland, OH. The Dodge Charger then traveled south on I-71 from Cleveland, OH to Columbus, OH.  At approximately, 10:28AM, investigators observed the Dodge Charger arrive at the location provided by the ATF UC.  Surveillance units observed that LORENZI was operating the vehicle and was accompanied by two other individuals, later identified as JACKSON and Jadden BEDELL.

28.     Continuing on May 26, 2022, JACKSON, LORENZI, and BEDELL engaged with the ATF UC SA's and exchanged U.S. currency for the previously arranged purchase of sixteen (16) SCCY Industries firearms.  Both JACKSON and BEDELL wrote information on a Bill of Sale document provided by the ATF UC SA.  After the transaction, LORENZI and JACKSON were arrested and BEDELL was temporarily detained.  The Dodge Charger was towed to a secure location was held pending execution of the previously described federal search warrant.

29.     As referenced above in paragraph #5, **TARGET TELEPHONE 1** was seized from the possession of Charles L. JACKSON during a pat down search of his person incident to

arrest; and **TARGET TELEPHONES 2 and 3** were recovered from inside the aforementioned Dodge Charger during the execution of the federal search warrant of the vehicle. More specifically, **TARGET TELEPHONE 2** was recovered from the cupholder inside a motor vehicle, which investigators believe to be LORENZI's telephone,[2] and **TARGET TELEPHONE 3**, which investigators believe to belong to BEDELL,[3] was recovered from the front passenger side floorboard of the vehicle.

30.     In sum, the investigation indicates the following regarding the suspected individuals involved in this firearm trafficking scheme: they are acquiring firearms in Columbus, Ohio, and the surrounding metropolitan area; they are secreting the firearms in vehicles and then transporting them to the Greater Cleveland area and as far as the State of New York; and they have utilized cellular telephones to communicate in regards to planning and furthering the firearm trafficking.

**B. The TARGET TELEPHONES Relationship to the Alleged Illegal Activity**

31.     The **TARGET TELEPHONES** identified in this requested search warrant were recovered from the person of Charles L JACKSON and from inside the Dodge Charger on May 26, 2022.  A Federal arrest warrant for violations of Title 18 U.S.C 371 and 18 U.S.C. 922(a)(1)(A), Conspiracy to violate federal law (engaging in the business of firearms dealing

---

[2] **TARGET TELEPHONE 2** was plugged into a charger inside the cupholder near the driver's seat, which is where LORENZI was seated. Additionally, when investigators first observed **TARGET TELEPHONE 2**, there was a map with directions to the pre-arranged meet location on the screen. **TARGET TELEPHONE 2** was placed into "airplane" mode, but ultimately, the telephone battery died prior to the execution of the search warrant.

[3] **TARGET TELEPHONE 3** was located on the front passenger floorboard, which is where BEDELL was seated inside the vehicle upon arrival at the pre-arranged meet location. **TARGET TELEPHONE 3** was placed into "airplane" mode, but ultimately, the telephone battery died prior to the execution of the search warrant.

without a license) was issued for LORENZI; and violations of Title 18 U.S.C 371 and 18 U.S.C. 922(a)(1)(A), Conspiracy to violate federal law (engaging in the business of firearms dealing without a license) and 18 U.S.C. 922(n), Unlawful receipt of a firearm(s) by a person under felony indictment, was issued for JACKSON related to the previously arranged purchase of sixteen (16) SCCY Industries firearms. When contacted by law enforcement and taken into custody, JACKSON was in possession of **TARGET TELEPHONE 1**, which was placed into airplane mode immediately. As previously mentioned, **TARGET TELEPHONES 2 and 3** were recovered from the search warrant of the Dodge Charger.

32.    The **TARGET TELEPHONES** are currently in the lawful possession of the ATF. While ATF might already have all necessary authority to examine the **TARGET TELEPHONES**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **TARGET TELEPHONES** will comply with the Fourth Amendment and other applicable laws.

33.    I know through training and experience that cellular telephone devices are commonly used to access social media such as the Instagram, Facebook, or SnapChat to receive and exchange messages related to unlawful acts.

34.    I also know through my training and experience, and in speaking with other law-enforcement officers, that cellular telephone devices are commonly used to arrange unlawful transactions—including the unlawful sale of firearms to prohibited persons; to facilitate those straw purchases through the exchange of photographs of the relevant firearms and proposed terms of payment; and to assist potential straw purchasers and intended recipients in meeting up with one another through use of the phone's GPS and mapping software and applications.

14

35.     In my training and experience, I know that the **TARGET TELEPHONES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET TELEPHONES** first came into the ATF's possession.  When the **TARGET TELEPHONES** was seized, investigators powered them off or placed them into airplane mode to maintain their integrity.  However, based upon **TARGET TELEPHONES 2 and 3** remaining inside the vehicle prior to execution of the search warrant, the telephones ultimately lost all battery life.

36.     Moreover, relevant here, your affiant knows individuals commonly use their cell phones to send text messages, voice messages, video messages and other chat based or social media platforms to discuss and plan their criminal activities.  Call logs, text logs, and content records showing such an arrangement are likely to still be on the **TARGET TELEPHONES**. Additionally, your affiant knows that individuals take pictures of their firearms, narcotics, and illegally derived proceeds, and those pictures can be stored on the devices.   In addition, cellular telephones are commonly in the physical possession of owners which would yield information as to where the conspirators may be meeting, secreting the firearms into vehicles, acquiring firearms for the purpose of diversion to the criminal market, or other actions in furtherance of the conspiracy.  Location data stored on the **TARGET TELEPHONES** is likely to show where the target cellular telephone was located during times of service, and that information, combined with other records, may display a time that all identified telephone numbers for co-conspirators were in the same general area of one another.  The information sought in this warrant will further establish the patterns of those involved in the conspiracy.

15

## **TECHNICAL TERMS**

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address is a series of four numbers, each in the range 0–255, separated by periods (e.g., 121.56.97.178).   Every computer or cellular telephone (beyond 2G technology) attached to the Internet must be assigned an IP address so that Internet traffic sent from and

16

directed to that computer or cellular telephone may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38. Based on my training, experience, and research, I know that the **TARGET TELEPHONES** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant ("PDA"). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the **TARGET TELEPHONES**. This information can sometimes be recovered with forensics tools.

40. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET TELEPHONES** were used, the purpose of its use, who used it, and when. There

is probable cause to believe that this forensic electronic evidence might be on the **TARGET TELEPHONES** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    a. Forensic evidence on a device can also indicate who has used or controlled the **TARGET TELEPHONES**. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer/cellular telephone is evidence may depend on other information stored on the computer and the application of knowledge about how a computer/cellular telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET TELEPHONES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET TELEPHONES** to human inspection to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43. Based on my knowledge, training, experience, and the investigation to date, I further submit that there is probable cause to believe that the property to be searched as described contains evidence, as described in Attachment A, of a violation(s) of: 18 U.S.C. § 922(a)(5), that is, transferring a firearm to an out-of-state resident; 18 U.S.C. § 922(a)(1)(A), that is, engaging in the business of dealing in firearms without a license; 18 U.S.C. § 2, that is, aiding, abetting, counseling, commanding, or soliciting a criminal act; and 18 U.S.C. § 371, that is, two or more persons conspiring to commit any offense against the United States.

44. Based on the foregoing, I request that the Court issue the proposed search warrant under Federal Rule of Criminal Procedure 41 to search the **TARGET TELEPHONES** as described and to seize those items set forth in Attachment A which constitute evidence, fruits, and instrumentalities of a violation(s) of 18 U.S.C. §§ 922(a)(5), 922(a)(1)(A), 2, and 371.

Respectfully submitted,

Teresa Petit
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Subscribed and sworn to before me
on June 1, 2022:


CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

1.     All records and information on the **TARGET TELEPHONES** described in the Affidavit in support that constitutes evidence of a violation of violation(s) of 18 U.S.C. §§ 922(a)(5), 922(a)(1)(A), 2, and 371 involving Martino D. LORENZI, Charles L. JACKSON, Jadden BEDELL, and other individuals named in the Affidavit in support of this warrant application, and other known and unknown co-conspirators since mid-December 2021, to present, including the following:

     a.  lists of contacts and related identifying information;

     b.  photographs;

     c.  internet history;

     d.  GPS data;

     e.  Text messages or messages stored in other messaging platforms;

     f.  Data stored on the **TARGET TELEPHONES** through social media platforms to include, Facebook, Instagram, Snapchat, and other unnamed platforms similar in nature;

     g.  any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

     h.  any information related to destination sources of firearms (including names, addresses, phone numbers, or any other identifying information);

     i.  any information recording the schedule or travel from 2021 to the present related to the user(s) of the **TARGET TELEPHONES**;

     j.  all bank records, checks, credit card bills, account information, and other financial records;

k. Stored electronic mail messages;

2.      Evidence of user attribution showing who used or owned the **TARGET TELEPHONES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

3.      Records evidencing the use of the Internet Protocol address to communicate with unnamed servers, including:

a. records of Internet Protocol addresses used; and

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2